UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| MAURICE JOHN,<br><br>Plaintiff,<br><br>v.<br><br>CORE BRACE, LLC,<br>and SME INDUSTRIES, INC.,<br><br>Defendants. | Case No. 4:20-cv-00071-BLW<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

The Court has before it Defendants' Motion for a Protective Order (Dkt. 14). Defendants seek an order prohibiting Plaintiff from deposing Dieter Klohn, the CEO and President of Defendants. Plaintiff opposes the motion (Dkt. 16). For the reasons discussed below, the Court denies the motion.

## BACKGROUND

**A. Incidents Leading up to John's Termination**

This is a racial discrimination lawsuit brought by Plaintiff, Maurice John, who is an African American, against Defendants, his former employers. The

MEMORANDUM DECISION AND ORDER - 1

allegations in the complaint (Dkt. 1)[1] discuss a series of incidents indicating that John was subjected to discrimination, a hostile work environment, and retaliation on account of his race.

When John was hired in April2019, he was told he would be trained to become a certified welder and he began welder training under a series of trainers. However, John was removed from welder training before being given as much time and opportunity to train as employees who were not African American. His removal occurred after he was told he failed his first weld test. However, an employee in quality control said that John passed the weld test, Defendants sent to a customer the part that John had welded for the weld test, and employees who were not African American were given second chances to pass a weld test.

A trainer in the welding program under which John trained took the position that John was not capable of being a welder. This trainer wore a jacket with a large Confederate flag on the back to work. When John complained to a supervisor about this trainer wearing a jacket with a Confederate flag to work, the supervisor merely told John that everybody has free speech rights and not to worry about it.

John was repeatedly subjected to outright racial slurs from both supervisors

---

[1] For purposes of resolving the pending motion for protective order, the Court assumes that the allegations in the complaint are true.

MEMORANDUM DECISION AND ORDER - 2

and coworkers. For example, a coworker said to John, "What's up my [n-word]?" And, a supervisor asked John if he could use the "[the n-word]" (using the actual word, not the euphemism) to which John said not to call him that.

     A shift lead asked John if he could use the "n-word" around him. When John said, "No," the lead responded, "Well, if I can't say that, I can call you a shithole!" This was apparently in reference to a comment made by President Trump referring to African nations as being "shithole" countries.

     A coworker approached John in front of a group of other coworkers, and asked John, in reference to the rap music John listened to at work, "Why are you listening to that music? It's [n-word] this and [n-word] that." The coworkers laughed.

     A coworker was given an assignment that involved throwing and stacking wood. While sitting at a lunchroom table next to John, this coworker stated loudly that he "ain't going to do no [n-word] work." John complained to his supervisor about the coworker's use of the n-word, but the incident was not taken seriously and it appeared that the offending coworker was rewarded rather than disciplined for the conduct.

     In yet another incident, both a supervisor and a shift lead, in directing John's work, referred to John as "boy" over the radio for all employees to hear, stating

"Put them over there boy!" "I ain't gonna tell you no more, boy!" "You hear me, boy?" When John complained about the use of the word "boy" in directing him, and that it was a racial slur, the lead merely denied that use of the term "boy" was a racial "thing" in Idaho. John never heard any other employee being called "boy" during his employment with Defendants.

When John complained to one of his supervisors about these types of incidents, the supervisors had said to John, on more than one occasion, "Don't make me fire you." Shortly before John was terminated, he overheard a coworker tell another coworker that he (John) was going to be set up to be fired. When John asked a supervisor and a coworker whether this was true, they responded that John was being a paranoid schizophrenic, and the supervisor told John that he knew John was a hard worker and that John had nothing to worry about.

A few days later, during his October 9, 2019, shift, a coworker approached John aggressively and told John that he needed something immediately. When John asked the coworker to back up because he was too close, the coworker responded aggressively with, "Or what?" A lead came over to the area and John told the lead that he felt threatened by the coworker. The lead reported over the radio that there was a problem between John and the coworker, and both John and the coworker were called into the supervisor's office. The supervisor blamed the

**MEMORANDUM DECISION AND ORDER - 4**

incident on John, even though John was not the aggressor.

**B. John's Termination**

On October 11, 2019, in the late morning, John reported to Defendants' corporate human resources department (HR) that he had been subjected to a racially hostile work environment. John was told that HR would initiate an investigation.

Within a few hours of making the report to HR, John called a supervisor, J. Cook, and requested that he (John) be moved to the day shift because he did not believe that the racially discriminatory and hostile work environment created by the night shift managers and his coworkers would end. Supervisor J. Cook responded by telling John that he had no open positions on the day shift, that he was tired of "this," that he had a number of complaints about John from coworkers, and that he was terminating John's employment. John believes that "this" refers to John's repeated complaints of a racially hostile work environment and complaints about being discriminated against based on his race. John had not previously been told of, and was not aware of, any purported complaints by coworkers and believes that the purported complaints were merely a pretext for terminating his employment.

As part of John's discharge from employment, J. Cook signed a document

called an "Employee Change of Status Request." This document is dated October 11, 2019, and states: "Maurice [John] has a couple of incidents on the floor with multiple employees (Verbal & Almost physical). He was sat down and talked to by his supervisors and leadman. Maurice had another altercation last night 10/10/. Maurice is terminated for unwillingness or inability to work in a cooperative manner with his co workers." (Dkt. 16-2.) The document was signed by J. Cook as the individual requesting the discharge. The form was also signed by a supervisor and by Dieter Klohn, as President. The form specifically states: "(NOTE: THIS REQUEST [IS] NOT FINAL UNTIL SIGNED BY DIETER KLOHN)." (*Id.*) Dieter Klohn is apparently President and CEO of Defendants, and Defendants' sister and parent companies.

### C. Utah Jazz Letter

Plaintiff filed the present action on February 13, 2020, alleging racial discrimination, hostile work environment, and retaliation in violation of 42 U.S.C. § 1981 and the Idaho Human Rights Act.

While this action was pending, Dieter Klohn signed a letter addressed to the Utah Jazz. (Dkt. 16-4.) The letter, which is on SME Steel Contractors, Inc., letterhead, is dated September 9, 2020, and was signed by Mr. Klohn as President. The letter was also signed by Craig Moyes, as CEO; Jerry Moyes, as owner; and

Gordon Holladay as VP Finance. The letter includes the following statements:

> Our disappointment and disillusionment with the recent actions of the NBA—including the owners, coaches and players of the Utah Jazz—are almost beyond expression. We have been stunned to see the entire Jazz team kneeling during the playing of our country's national anthem. Like other fans throughout the country, SME was disappointed that the 2019-20 season was disrupted by the COVID pandemic. That disappointment pales, however, to the feelings we experienced when NBA games "restarted" on what appears to be a billboard for the "Black Lives Matter" movement. The final evidence of NBA disregard for its fans and customers was the recent wildcat strike engaged in by NBA players-resulting in the frivolous disruption of scheduled playoff games.
>
> Performance of the "Star Spangled Banner" at the commencement of sporting events has been a tradition in this country for nearly 100 years. Standing quietly and respectfully during the anthem is not merely an antiquated or courteous tradition, it is a way of honoring the many thousands who have protected this country and its unique freedoms-through their service and sacrifice. Too [sic] say the least, it is ironic that pampered and exceptionally well-paid athletes cavalierly exercise the freedom bought for them through the courage, and sacrifice of this nation's servicemen and women by disrespectfully kneeling during the country's anthem. By the same token, it seems odd and inappropriate for NBA players to adorn their jerseys with names and tributes for felons and politically-divisive slogans from Black Lives Matter, when true heroes like Chris Kyle and Pat Tillman go unnoticed and unremarked.

(Dkt. 16-4.) This letter was made public and, following that public disclosure, Mr. Klohn made public comments regarding the letter. *See* https://www.deseret.com/utah/2020/9/24/21454388/black-lives-matter-sme-steel-calls-nba-utah-jazz-gail-miller-support-political-propaganda.

Plaintiff seeks to take the deposition of Mr. Klohn, citing both to Mr.

Klohn's signature on the Employee Change of Status Request form approving John's termination, and Mr. Klohn's signature on the Utah Jazz letter. Defendants seek a protective order preventing that deposition.

## LEGAL STANDARD

The Court may, "for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense," including prohibiting a deposition or limiting the scope of a deposition. Fed. R. Civ. P. 26(c)(1). The party seeking protection bears the burden of demonstrating good cause exists for the issuance of a protective order by demonstrating harm or prejudice will result from the requested discovery. *Rivera v. NIBCO, Inc.*, 364 F.3d 1057, 1063 (9th Cir. 2004).

> When a party seeks the deposition of a high-level executive (a so-called "apex" deposition), courts have "observed that such discovery creates a tremendous potential for abuse or harassment." The court therefore has discretion to limit discovery where the discovery sought "can be obtained from some other source that is more convenient, less burdensome, or less expensive."
>
> "In determining whether to allow an apex deposition, courts consider (1) whether the deponent has unique first-hand, non-repetitive knowledge of the facts at issue in the case and (2) whether the party seeking the deposition has exhausted other less intrusive discovery methods." However, "a party seeking to prevent a deposition carries a heavy burden to show why discovery should be denied." Thus, it is very unusual "for a court to prohibit the taking of a deposition altogether absent extraordinary circumstances." "When a witness has personal knowledge of facts relevant to the lawsuit, even a corporate president or CEO is subject to deposition." "A claimed lack of knowledge, by itself it is insufficient to preclude a deposition."

*Apple Inc. v. Samsung Elecs. Co., Ltd,* 282 F.R.D. 259, 262-63 (N.D. Cal. 2012).

## ANALYSIS

Defendants argue that Plaintiff should be precluded from deposing Mr. Klohn because he is an apex employee and his testimony is not relevant, not proportional, and the deposition will serve mainly to harass. Defendants contend that, with the sole exception of whether Mr. Klohn signed termination paperwork, he has no first-hand knowledge of the facts at issue in this case. They contend that Klohn's "sole involvement was the ministerial act of signing the change of status paperwork" and that he "has no recollection of signing" that paperwork. In support, Defendants have provided a declaration from Mr. Klohn. (Dkt. 14-2.) In his declaration, Mr. Klohn asserts he has no first-hand knowledge regarding John's hiring, employment, or termination; that he was not consulted or advised regarding John's termination; has no recollection of signing any documents regarding John, including his termination; and is not typically involved in managers' decisions on employment, transfer, or termination of "production-level employees." (*Id.*)

Despite Defendants' position on this issue, and Mr. Klohn's declaration, the fact remains that Mr. Klohn signed the Employee Change of Status Request form, which specifically states it is not final until signed by him. Further, John has submitted copies of Employee Change of Status Request forms for other

apparently production-level employees, some of which are not signed by Mr. Klohn. (*See* Dkt. 16-3.)[2] Plaintiff's counsel is entitled to inquire into, among other things, Mr. Klohn's involvement in and knowledge of employment and general HR decisions, why his signature appears on forms for some production-level employees and not others, the circumstances of his signature on the Employee Change of Status form for John, and his knowledge regarding John's employment and termination. Mr. Klohn's mere assertion that he does not have relevant first-hand knowledge is insufficient to preclude his deposition. *See Apple Inc.*, 282 F.R.D. at 263 ("A claimed lack of knowledge, by itself it is insufficient to preclude a deposition." (citations omitted)).

Defendants also contend that the deposition of Mr. Klohn should be precluded because a 30(b)(6) deposition, depositions of J. Cook and HR employees with whom John spoke, and the use of interrogatories would eliminate the need for Mr. Klohn's deposition. However, Plaintiffs are, as discussed above, entitled to make inquiries into Mr. Klohn's involvement and knowledge. The deposition of

---

[2] Plaintiff has moved to seal some of the documents submitted by Plaintiff in his opposition to Defendants' motion for protective order. (*See* Dkt. 17; Dkt. 16-3.) The motion to seal these documents is unopposed. Because the documents Plaintiff seeks to seal have personal information regarding Defendants' employees who are not a part of this litigation, the Court finds good cause for and will accordingly grant the motion to seal.

**MEMORANDUM DECISION AND ORDER - 10**

other employees and interrogatories will not provide that information or act as an adequate substitute for the deposition of Mr. Klohn. Mr. Klohn's position as president of Defendant companies does not shield hm from being deposed.

Finally, Defendants contend that Mr. Klohn should not be subject to deposition based on his signing of the Utah Jazz letter. Defendants contend that the letter has no relevance to this case because it was signed almost a year after John was terminated and is therefore not probative of the basis for that termination; was sent by a different entity, i.e., not by Defendants but instead by a sister (or parent) company; and was signed by individuals who have no meaningful connection with John's termination. Further, Defendants contend, the letter is merely expressing opposition to political action by the Jazz. The Court finds Defendants' arguments unconvincing.[3]

First, the letter is signed by Mr. Klohn. As discussed above, there are indications that Mr. Klohn was involved in John's discharge and was involved in and has knowledge about Defendants' employment practices in general.

Second, that the Utah Jazz letter was sent by a sister (or parent) company

---

[3] Defendants also argue that the letter is not admissible under the Federal Rules of Evidence. However, the admissibility of the letter as evidence is not before the Court and is not determinative of whether John's counsel should be able to inquire, during a deposition of Mr. Klohn, into the letter and Mr. Klohn's public comments after the letter was made public.

and was sent almost a year after John's termination does not detract from the potential that the letter may reveal a general culture at Defendant companies. This is particularly true given that Mr. Klohn is the president of both Defendant companies and the company that sent the letter. Further, that the letter was sent almost a year after John's termination does not detract from the potential of the letter to reveal the general culture within Defendant companies prior to and at the time of John's termination.

Third, although the letter may, as Defendants claim, merely be expressing opposition to political action by the Jazz, the letter can also be viewed as criticizing the Black Lives Matter (BLM) movement in general and expressing opposition to African Americans or others complaining about racism and racial discrimination. The letter is openly critical of the BLM movement paying "tribute" to slogans and individuals (presumably Black Americans) that the letter characterizes as "politically-divisive" and "felons," and the failure to recognize two specific individuals, that the letter characterizes as "true heroes," both of whom happen to be Caucasian.[4] (Dkt. 16-4.) In light of the allegations in the complaint, that indicate

---

[4] The Court takes judicial notice, for purposes of deciding this motion, that both Pat Tillman and Chris Kyle, who were the individuals specifically named in the letter as the "true heroes" who go "unnoticed and unremarked," were Caucasian.

a culture of racial discrimination, a racially hostile work environment, and retaliation, John's counsel should be allowed to inquire into both the Utah Jazz letter and Mr. Klohn's comments after the letter was made public.

## ORDER

**IT IS ORDERED that**

1. Defendants' motion for protective order (Dkt. 14) is **DENIED**.
2. Plaintiff's unopposed motion to seal (Dkt. 17) is **GRANTED.** Exhibit B to the Declaration of DeAnne Casperson (Dkt. 16-3) is ordered **SEALED.**

DATED: January 29, 2021

B. Lynn Winmill
U.S. District Court Judge