## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

MAURICE JOHN,

      Plaintiff,

      v.

CORE BRACE, LLC,
and SME INDUSTRIES, INC.,

      Defendant(s).

Case No.  4:20-cv-00071-BLW

**MEMORANDUM DECISION
AND ORDER**

### INTRODUCTION

Plaintiff, Maurice John, brought this action against Defendants, Core Brace, LLC, and SME Industries, Inc., alleging racial discrimination, hostile work environment, and retaliation in violation of 42 U.S.C § 1981, Title VII of the Civil Rights Act of 1964, and the Idaho Human Rights Act. Before the Court is Defendants' motion for summary judgment (Dkt. 20), John's motion to strike (Dkt. 27), and John's motion to supplement the summary judgment record (Dkt. 28). For the reasons discussed below, the Court will deny the motion to strike, grant the motion to supplement, and deny the motion for summary judgment.

# BACKGROUND[1]

John was hired by Defendants as a welder at their Pocatello facility on April 18, 2019. Some of the individuals in John's chain of command during his employment are Sean Cook ("S. Cook"), one of John's direct supervisors during his employment with Defendants; Jake Schnobrich, another direct supervisor and the PIM lead over John; Nicholas Loertscher, the night shift supervisor at CoreBrace during the last couple of months that John was employed by Defendants and to whom Schnobrich reported; and Jerry Cook ("J. Cook"), the manager of the CoreBrace Pocatello facility, and to whom Loertscher reported.

## A. Weld Test

John was one of only two Black employees when he was hired by CoreBrace. He was given one week of training on welding, and one chance to pass a weld test which comprised of two welds, only one of which was reviewed. John

------

[1] In deciding Defendants' summary judgment motion, the Court must view the facts, and all reasonable inferences that can be drawn from those facts, in the light most favorable to John, the nonmoving party. *See Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) ("Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law.") (citing *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir.2000) (en banc)). Thus, the Court's recitation of the fact is based on the Court's construing the evidence in the light most favorable to John.

did not pass the weld test and was not given any further opportunities for more training, nor was he given another chance to pass the weld test. Instead, he was moved to a physical labor job in PIM. Other similarly situated employees were given multiple opportunities to pass the weld test.

One of the individuals who administered the weld test to John was Jesse Huff. Huff, who was also one of John's trainers, said to John, "What's up my [n-word]?" as he passed John. John found Huff's comment to be offensive and believed it violated company policy, but he did not report the incident because he believed that if he reported every offensive remark he experienced, the company would retaliate.

Another one of John's trainers, Jack Tieken, wore a jacket to work with a Confederate flag on the back and made sure that John saw it. John complained to supervisor S. Cook about Tieken's jacket, and S. Cook said to John that it was "freedom of speech" and that John needs to just put his head down and get to work. Shortly after Loertscher became John's night manager, John reported to Loertscher John's concerns that his coworkers were prejudiced against him and were plotting to get him fired.

## B. Racially Demeaning and Derogatory Conditions

During his employment, John was subjected to an ongoing series of racially

demeaning and derogatory conditions. First, there are the incidents, just discussed:
John being called, "What's up my [n-word]?" by Huff, who was one of his welding
trainers and who also administered John's weld test; John having another of his
welding trainers, Tieken, wear a jacket with a confederate flag on it and appearing
to intentionally make sure that John saw the flag; and supervisor S. Cook telling
John, in response to John's complaint about the confederate flag jacket being worn
to work, that the coworker/trainer's wearing of the confederate flag jacket was
merely freedom of speech. In addition, there were numerous other incidents that
occurred during the course of John's employment.

On John's first day on the job, S. Cook, one of John's direct supervisors,
approached John and asked him, "Maurice, what do you think about the n-word?"
John said he did not like it.

Roger Davis, a co-worker of John's, said, in the presence of John, that he
"wasn't going to do any [n-word] work." When Davis realized that John was
present, he apologized. John reported the incident to supervisor S. Cook. When
John did so, S. Cook again used the n-word in clarifying the incident. S. Cook then
said he would discuss the incident with Loertscher, but John reported it to
Loertscher himself, not trusting whatever report S. Cook might make. Loertscher
disciplined Davis by issuing him a verbal warning and also apparently sending him

home for the rest of the shift. However, this was not documented through a writeup like other employees who received time off without pay as part of a disciplinary action. Further, the next day, Davis returned to work with a new CoreBrace hat, which is generally given out as a reward. Loertscher also provided additional training to employees on the company's anti-discrimination policies, covering multiple forms of discrimination so as not to single out John.

Supervisor Schnobrich also asked John how John felt about Schnobrich saying the "n-word," and John responded that he did not want Schnobrich to say the "n-word." Schnobrich then said, "Well, why don't I call you shithole?" This was an apparent reference to the statement by former President Trump, who described Haiti, El Salvador, and African Nations as "shithole countries," during a meeting at the White House. *See* https://www.nytimes.com/2018/01/11/us/politics/trump-shithole-countries.html (accessed 7/23/2021). At the time, John did not understand the significance of the "shithole" reference by Schnobrich.

On September 4, 2019, about a month before John's employment was terminated, supervisor Schnobrich called John "boy" several times. John had asked Schnobrich where he should place some beams and Schnobrich responded, "Put them right here boy. You hear me boy? I ain't going to tell you no more, boy!" Schnobrich's tone made John feel like a slave. John complained to supervisor

Loertscher about Schnobrich's use of the term "boy," explaining that the word "boy" was offensive. When John complained to Loertscher about the "boy" incident, Loertscher said to John, "Don't make me fire you." And, according to Loertscher, Schnobrich was "off put" by John's complaint about this "boy" incident.

Supervisor Loertscher also called John "boy" over the radio, telling John to, "hurry up, boy." A co-worker heard Loertscher refer to John as "boy" over the radio and it was apparent to this co-worker that, from the tone of voice Loertscher used, the use of the term "boy" was meant to be demeaning. John never heard either Loertscher or Schnobrich use the term "boy" for anyone but John.

J. Cook admitted that a Black man being called "boy" is offensive, and conducted a short, general meeting with the night shift employees after the "boy" incidents occurred. During that meeting, J. Cook merely stated in general terms that discrimination is not tolerated.

On September 5, 2019, the day after John complained about being called "boy" by his supervisors, John received a verbal warning for bending braces.[2] The

---

[2] John admits that he bent the brace. He explains that he was being trained on the Combilift, which has a blind spot. John thought that he had the forks (Continued)

following day, September 6, 2019, these same supervisors that had called John

"boy"—Loertscher and Schnobrich—pulled John into the office and claimed that

they were getting a lot of complaints from John's coworkers about John having a

"hostile attitude towards others," and being "hostile and aggressive." They told

John that he needed to "remain calm and professional" no matter how his

coworkers interacted with him; that "his job [entails] a lot of contact with a lot of

different personalit[ies]" in the shop; and that John needs to "conduct himself in a

professional manner." Loertscher told John that John needed to "straighten up and

walk on a narrow path." Neither Loertscher nor Schnobrich identified any specific

incidents during the meeting where John had acted inappropriately, and John

denied (and continues to deny) that he had engaged in any type of aggressive or

inappropriate behavior.

  During his deposition, Loertscher claimed that he had received multiple

complaints about John being "aggressive" but when pressed for specifics,

Loertscher only identified two purported incidents. John denies that either of these

purported incidents ever occurred or that he was aggressive toward other

_____

underneath the brace but because of the blind spot, he had only part of the brace on
the forks. As a result, when he lifted the forks, it bent the brace. When John
realized what had happened, he called his supervisor and told him about the
problem.

employees.

During the September 6, 2019 meeting with Loertscher and Schnobrich, John requested that he be removed from the Combilift position and be put back on PIM. John explained that he requested this change because management was not able to physically see him work when he was operating the Combilift and he felt he was thus more vulnerable to false accusations while operating the Combilift. John explained: "I wasn't around a supervisor a lot, so people was making up stuff about me and saying I wasn't doing this and doing that. . . . [T]hey would say stuff like, 'well, he almost hit this' or 'he was too fast, driving too fast doing this right here' or 'he wasn't looking, doing this' or 'he had an angry face out here.'" John believed a position in PIM would allow management to see more easily that he was not engaging in any of the behaviors of which he had been accused. However, despite this move back to PIM, Loertscher pushed to get John fired.

Joe Pompa, a former CoreBrace supervisory-level employee who worked at CoreBrace during the relevant time, explained that he "frequently heard the n-word used by both coworkers and managers" at CoreBrace and that, based on his experience working there, the n-word was "used quite casually." Pompa heard Schnobrich "use the n-word on multiple occasions at work"; and heard Schnobrich make statements to the effect that Schnobrich thought it was "funny to move Mr.

John around from department to department just to mess with him," and that Schnobrich called John a "silly [n-word]." Pompa also believed, based on his own observations, that Loertscher and Schnobrich treated John more harshly than other employees, including being overly critical of John's performance and actions, and that they engaged in conduct just to mess with John because of his race. Finally, based on his own observations and interactions, Pompa found John to be "a very hard worker who did not cause any trouble or conflict," and Pompa had never observed any interactions between John and others where John acted in an aggressive manner.

### C. Employee Discipline

In mid-July 2019, Defendants wrote John up on the ground that John allegedly "stabbed the wrong brace in the wrong core." Even though this was John's first write up, Defendants suspended John for five days.

A co-employee, Cody Rasmussen, told John that he (John) had not stabbed the wrong brace. Rasmussen also admitted that if the incident occurred as Defendants asserted it did, other individuals besides John should have also been written up but were not. Further, according to Rasmussen, Defendants never fixed the brace that John allegedly damaged and the brace was sent out to a client. This indicates that John did not actually damage the brace as claimed by Defendants.

Finally, Noah Spradling, who was John's co-worker and is now a supervisor at CoreBrace, stated that John was right about being concerned that Defendants would try to fire John for "nothing."

On two occasions when John was operating the Combilift, he bent a brace (one of those incidents has been discussed above). Bending a brace while operating the Combilift is generally the result of not paying proper attention. However, there is also a blind spot while operating the Combilift. As noted above, John was given a verbal warning after the second incident.

### D. The Termination

Shortly before John was fired, he overheard a couple of coworkers—Crystal, Olivia and Marcello Jones (another Black employee)—discussing that they disliked John and that they were going to try to get him fired.[3] John complained to his supervisors, Schnobrich and Loertscher, about what he had heard, and they told John that he was being paranoid, to "[j]ust keep working. You're doing a good job." Later that shift he saw these coworkers coming out of the supervisors' office. John then walked into the office and said, "Nic [Loertscher], I told you."

---

[3] John explained that Marcello Jones was, at the time, a relatively new employee. John further explained that the other two coworkers—Crystal and Olivia—had kind of taken Jones under their wing.

Loertscher responded, "Listen, don't even worry about what they say, Maurice. I'm the boss here. You're doing a good job. Just keep on doing what you are doing."

The day before Defendants terminated John's employment, Marcello Jones behaved in an aggressive manner toward John. Defendants claim that John was the aggressor toward Jones, but John insists that the opposite is true. The incident began when Jones told John to give him a shovel that John was holding. The incident was entirely verbal and, although supervisor Schnobrich was in the area when this incident occurred, he could not hear the exchange between John and Jones.

John explained the incident as follows during his deposition:

> Okay. Well, me and Norm was actually working together. We did a lot of braces and I remember it was cold he [there] was a heater running. And after work is over we have to clean up and everything. So I went and got the shovel and I stood by the heater for . . . a couple of seconds. And Jake [Schnobrich] had actually come walking by, and I forgot what I was talking to Jake about, and [Jones] came up to me and he was just like: Since you're up here talking man, let me get that shovel. And I was like: Give me one second. I'm going to ask him [Jake] another thing. I'm about to help my partner get this right here . . . . [Jones] could have went and got another shovel. There's a lot of shovels actually around.
> And he was just like: No, give it to me right now since you won't – and I told him: Man, get out of my face, man.
> So he came up on me and he was like: Or what? And he's a big guy, you know.
> So Jake [Schnobrich], he actually said: Man, you all just go back to work. So I still had the shovel in my hand and I went to shovel it up, but it

was bothering me so I called Jake over. I said: Man, I think something needs to happen to this guy because I feel threatened, you know, the way he came to me and you just let it go. Because I was feeling if it was me I would have been in the office and it would have been a whole shebang.

So, [Schnobrich] called Nic [Loertscher] on the . . . radio and told Nic: "Maurice and Marcello is having a problem and I'm tired of this right here."

(Dkt. 22-3 at 12.)

They—Schnobrich, Loertscher, John, and Jones—all went into the office and John told Loertscher what had happened. Jones responded, "Yeah, but he told me to get out of his face." After that, the supervisors focused only on John. Loertscher told John, "Well, Maurice, yeah, I get a lot of complaints about you." (*Id.* at 13.) John responded, "But you see that I'm working every day," and "we already discussed the complaints." Loertscher responded that he was going to make Jones and John work together for a week, explaining, "you all are acting like are getting into it and stuff like that, I'm going to make you work together for a week and you all are going to be friends." (*Id.*)

John was so upset about what had happened and how it was handled that he tried calling the Human Resources office (HR) as soon as he finished work. However, because it was the middle of the night, he was unable to. He wanted to call HR because he was fed up with everything and going through the chain of command, in John's view, wasn't working, so he felt like he needed to take this to

another level. He also really wanted to go to day shift because all of the supervisors, all of the bosses, are there during the day shift, so "you really can't just make no false complaints about me and false accusations . . . ."

John called HR again the next morning, calling back several times before he got through. John finally spoke with Kent Eden at 11:46 a.m. John reported to Eden multiple incidents of racism that John had endured during his employment. John explained that he wanted to be moved to the day shift. Eden asked John some questions, then told John that he wanted John to talk to someone else in the office—a woman named Debbie Nadeau—who handled those types of issues.

Eden testified that he passed John's complaint on to Debbie Nadeau and had no further involvement regarding John. However, Nadeau testified that Eden told her that John had been terminated. Further, there is evidence indicating that immediately after John reported these incidents of racism to HR, the HR department began compiling information against John because they were concerned about liability, indicating knowledge that John was about to be terminated. John spoke with Nadeau later that day but, by then, he had already been terminated.

After talking with Eden, John called J. Cook but got no answer. John called J. Cook again and got in touch with him. John explained to J. Cook that he [John]

had been having problems on the night shift and wanted to move to the day shift. J. Cook responded that they did not have any positions on the day shift and that he was going to have to let John go. John asked whether they had also let Jones go, and J. Cook said that he could not discuss that with John as it was confidential. J. Cook told John that the reason he was being terminated was because J. Cook was tired of the "complaints." John understood the "complaints" to which J. Cook was referring to be John's complaints of racial discrimination or the false complaints that had been made against John.

J. Cook relied on Loertscher and Schnobrich's input in deciding to terminate John's employment. J. Cook knew of John's complaints of race discrimination, such as John's complaints about the use of the "n-word" and "boy," including by Loertscher and Schnobrich. Despite this knowledge, J. Cook never investigated these incidents nor elevated them to HR like he did for White employees. For example, on two occasions White women's complaints of sexual harassment were taken to HR and investigated, and employees were disciplined as a result of the complained-of incidents. Non-Black workers were also given less severe discipline and multiple chances to change their behavior.

On the morning John was terminated, Loertscher reported to J. Cook the incident that had occurred the previous evening between John and Jones.

Loertscher explained that he could not get a clear story out of either Jones or John, but indicated that John, rather than Jones, was the aggressor, and that reports of John acting aggressively were becoming a concern. J. Cook decided to terminate John's employment without ever hearing John's version of the facts, and despite knowledge of the use of racial slurs regarding John by the very people upon which he was relying to terminate John's employment.

## ANALYSIS

### A. Motion to Strike

#### *1. Legal Standard*

"It is improper for a moving party to introduce new facts or different legal arguments in the reply brief than those presented in the moving papers*." United States ex rel. Giles v. Sardie*, 191 F. Supp. 2d 1117, 1127 (C.D. Cal. 2000) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894095 (1990)); *see also Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief."). Further, Local Civil Rule 7.1 requires that the moving party must "file with the motion affidavits required or permitted by Federal Rule of Civil Procedure 6(c), declarations submitted in accordance with 28 U.S.C. § 1746, copies of all photographs, documentary evidence and other supporting materials on which the moving party intends to rely". Id. Civ. L.R. 7.1(b)(2).

This Court has the discretion to either allow or preclude the filing of a sur-reply. *United States v. Venture One Mortg. Corp.*, Case No: 13-CV-1872 W (JLB), 2015 WL 12532139, at *2 (S.D. Cal. Feb. 26, 2015). Such discretion "should be exercised in favor of allowing" a sur-reply "only where a valid reason for such additional briefing exists, such as where the movant raises new arguments in its reply brief." *Id*. (citation omitted).

### 2. Discussion

In his motion to strike (Dkt. 27), John seeks to strike the second declaration of Jetta Hatch (Dkt. 25-1) and Rebuttal Statement of Facts (Dkt. 25-2) submitted by Defendants in support of their motion for summary judgment. John contends that Defendants' rebuttal statement of facts in support of summary judgment is improper because, under Federal Rule of Civil Procedure 6(c)(2), the moving party is to submit all supporting material with the original motion. John further contends that Defendants' submission of the second declaration and rebuttal statement of facts is fundamentally unfair. Alternatively, John asks that if the second declaration and the rebuttal statement of facts are not stricken, then John should be given an opportunity to file a sur-reply and provides that sur-reply in the memorandum in support of the motion to strike. (*See* Dkt. 27-1.)

Defendants respond that they have not raised new arguments or evidence in

their reply brief but are instead merely responding to the arguments raised by John in his opposition to summary judgment. They argue that accordingly the motion to strike should be denied.

The Court will deny the motion to strike because the second declaration of and the rebuttal statement of facts appear to respond to specific issues raised by John in his response brief. Furthermore, although this evidence was available at the time Defendants filed their initial motion, this does not preclude Defendants from raising the evidence in their reply as long as it is being raised specifically in response to arguments raised by John in his response. The Court will, however, allow and consider John's sur-reply to that additional evidence.

### B. Motion to Supplement

#### 1. Legal Standard

A district court has broad discretion to determine whether a party may supplement a summary judgment record. *See Navellier v. Sletten*, 262 F.3d 923, 941 (9th Cir. 2001) (the Ninth Circuit "review[s]. . .challenges to trial court management for abuse of discretion"); *Moreno v. Ross Is. Sand & Gravel Co.*, No. 2:13-cv-00691-KJM-KJN, 2015 WL 5604443, at *5 (E.D. Cal. Sept. 23, 2015) ("A district court has discretion to permit a litigant to supplement the summary judgment record.") (citing *Betz v. Trainer Wortham & Co.*, 610 F.3d 1169, 1171

(9th Cir. 2010)).

### 2. Discussion

John moves the Court for leave to supplement the summary judgment record with a declaration of Joe Pompa, who is a former CoreBrace supervisory-level employee who worked at CoreBrace during the relevant time. (Dkt 28.) John contends that in late March, he ran into Pompa at a convenience store and discovered that Pompa had personally observed action relevant to John's case against Defendants.

Defendants oppose the motion. Defendants contend that John did not timely disclose Pompa as a witness because John could have obtained this evidence prior to the close of discovery in January 2021, and prior to responding to the motion for summary judgment in mid-March 2021. Defendants also argue that Pompa's declaration is hearsay, and no hearsay exception applies and thus is inadmissible.

The Court will grant the motion to supplement. First, as to timeliness, John explains that he had not seen Pompa since he was terminated, and did not know that Pompa had personal knowledge or observations relevant to this case, until John bumped into Pompa at a convenience store in late March 2021. John disclosed the information to Defendants a short time later. Moreover, Pompa was a management-level employee with CoreBrace, working with both Loertscher and

Schnobrich, and the majority of the conduct Pompa discusses in his declaration is conduct in which Loertscher and Schnobrich allegedly engaged. Defendants thus could have previously discovered the information provided by Pompa in his declaration. The Court finds that the circumstances provide good cause for the late disclosure of this evidence.

Second, the statements in the Pompa declaration are not excludable as hearsay. Pompa's statements regarding the use of the racist and derogatory words are not being submitted for the truth of the matter and thus are not hearsay. *See* Fed. R. Evid. 801(c). Further, Pompa's statements regarding the alleged conduct and statements by other employees, including management-level employees, are admissible as an opposing party statement because it "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D).

The Court will grant the motion to supplement the record with the Pompa declaration.

### C. Motion for Summary Judgment

John brings claims under 42 U.S.C. § 1981, Title VII, and the Idaho Human Rights Act. The Ninth Circuit has held that the same legal principles applicable to a Title VII claim govern actions brought under § 1981. *See Reynaga v. Roseburg*

*Forest Products*, 847 F.3d 678, 686 (9th Cir. 2017). Similarly, the Idaho Supreme Court has held that the same legal standards applicable in Title VII cases govern actions under the Idaho Human Rights Act. *Bowles v. Keating*, 606 P.2d 458, 462 (Idaho 1979). Accordingly, any discussion in this decision regarding John's Title VII claims also applies to his § 1981 and Idaho Human Rights Act claims.

### 1.  *Summary Judgment Standard*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that may affect the outcome of the case, and a dispute about a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

In deciding whether there is a genuine dispute of material fact, the Court must view the facts in the light most favorable to the nonmoving party. *Id.* at 255. The court is prohibited from weighing the evidence or resolving disputed issues in the moving party's favor. *Tolan v. Cotton*, 572 U.S. 650, 657 (2014).

### 2.  *Hostile Work Environment*

Under Title VII, it is unlawful for an employer to discriminate against an individual with respect to "compensation, terms, conditions, or privileges of

employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. 2000e–2(a)(1). "This includes a prohibition against the creation of a hostile work environment." *Reynaga*, 847 F.3d at 686 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *Woods v. Graphic Comm'ns*, 925 F.2d 1195, 1200 (9th Cir. 1991)).

To prevail on a race-based hostile work environment claim, a plaintiff must demonstrate "(1) that he was subjected to verbal or physical conduct of a racial . . . nature; (2) that the conduct was unwelcome; and (3) that the conduct was sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive work environment." *Vasquez v. Cty. of Los Angeles*, 349 F.3d 634, 642 (9th Cir. 2003).

Defendants do not dispute for purposes of summary judgment that the first two elements are met here—that John was subjected to verbal or physical conduct of a racial nature, and that the conduct was unwelcome. Instead, Defendants dispute only the third element. They argue that the undisputed facts demonstrate that the conduct was not sufficiently severe or pervasive to alter the conditions of John's employment and create an abusive work environment. Specifically, they contend that the incidents of which John complains were merely offensive utterance, offhand comments, and isolated incidents, and, as such, the incidents are

insufficient to create a hostile work environment. The Court disagrees.

John has submitted evidence that, when viewed in the light most favorable to him, as the non-moving party, shows the following: CoreBrace employees, including supervisory-level employees, regularly and casually used the n-word in the workplace and, on a few occasions, used the n-word around John and directed that word at him. When a supervisor asked John if he could call John the n-word, and John said "no," the supervisor said that he could just call John "shithole" instead. Supervisory-level employees also moved John around, from job to job, and thought it was funny to move John around from department to department "just to mess with him," referring to John as a "silly [n-word]." Also, when John complained to a supervisor that a co-worker wore a jacket to work that had a confederate flag on the back, John was told by the supervisor that this was freedom of speech and that John needed to just put his head down and get to work.

Supervisory-level employees also called John "boy" in a derogatory way and, when John complained to his supervisors about being called "boy," John was told that one of his supervisors was "off put" by his complaint and another supervisor said, "Don't make me fire you." In the days after John complained to his supervisors about them calling him, "boy," John was disciplined with a 5-day suspension for bending a brace; and was told that there had been a lot of

complaints about him being "hostile and aggressive," even though no specific incident was cited at the time, and even though John had not engaged in aggressive or hostile conduct. John also overheard co-employees talking about trying to get John fired and when John reported this to his supervisors, he was told that he was being paranoid.

These facts, viewed in the light most favorable to John, are sufficient to raise a genuine dispute of fact as to whether the conduct to which John was subjected was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive work environment.

### 3. Racial Discrimination

To prevail in a Title VII case, a plaintiff must establish a prima facie case of discrimination. *Vasquez*, 349 F.3d at 641. "If the plaintiff succeeds in doing so, then the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly discriminatory conduct. If the defendant provides such a reason, the burden shifts back to the plaintiff to show that the employer's reason is a pretext for discrimination." *Id.* (citation omitted).

To establish a prima facie case, a plaintiff must provide evidence that creates an inference of unlawful discrimination through either the framework set forth in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973),[4] or direct or

circumstantial evidence of discriminatory intent. *Vasquez*, 349 F.3d at 641. "Direct

evidence is 'evidence which, if believed, proves the fact [of discriminatory animus]

without inference or presumption.'" *Id.* (alterations in original) (citation omitted).

The Ninth Circuit "has set a high standard for the granting of summary

judgment in employment discrimination cases." *Schnidrig v. Columbia Mach.,*

*Inc.,* 80 F.3d 1406, 1410 (9th Cir. 1996). Very little evidence is required "to

survive summary judgment in a discrimination case, because the ultimate question

is one that can only be resolved through a searching inquiry—one that is

appropriately conducted by the factfinder, upon a full record." *Id.* (citation and

internal quotation marks omitted).

Here, Defendants contend that John has failed to meet his burden of

establishing a prima facie case of discrimination. The Court disagrees and finds

that, viewing the facts in the light most favorable to John, he established a prima

facie case and that there are genuine disputes of material fact that preclude granting

---

[4] Under the *McDonnell Douglas* framework, "unlawful discrimination is
presumed if the plaintiff can show that (1) [he] belongs to a protected class, (2)
[he] was performing according to [his] employer's legitimate expectations, (3) [he]
suffered an adverse employment action, and (4) other employees with
qualifications similar to [his] own were treated more favorably." *McDonnell
Douglas*, 411 U.S. at 802.

summary judgment.

For example, there is evidence that John was given only one week of welding training and a single opportunity to pass the weld test while other, non-Black employees were not only given more training but were also given multiple opportunities to pass the test.

There is evidence that when John made complaints about racial incidents—such as racial slurs and a co-worker wearing a jacket with a confederate flag—the matters were, with one exception,[5] either dismissed, minimized, or not taken seriously, and were not investigated or referred to HR. Indeed, even supervisory personnel engaged in racial slurs. John was also told that he needed to remain "calm" and "professional" no matter how he was treated or what was said to him. Yet, when complaints regarding sexual harassment were made by White women, those complaints were referred to HR for investigation.

There is evidence that John's supervisors not only engaged in racial slurs, but also moved John around, from job to job, because it was funny and in order to "mess" with John, referring to John as a "silly [n-word]."

There is evidence that John was disciplined more harshly than his White co-

---

[5] The one exception is the incident in the lunchroom when a co-worker said that he was not going to do any "[n-word]" work.

workers. John received a five-day suspension for his first disciplinary offense of purportedly putting the wrong core in the brace. In contrast, White co-workers were given less harsh discipline and multiple chances to change problem behavior.

Defendants contend, nonetheless, that because J. Cook both hired and fired John, the "same actor" inference applies, and J. Cook's actions cannot be deemed to be discriminatory.

Generally, if the same person is responsible for both the hiring and the firing of a plaintiff bringing a discrimination claim, a strong inference arises that the firing was not discriminatory. *Coghlan v. Am. Seafoods Co., LLC*, 413 F.3d 1090, 1096 (9th Cir. 2005) (citing *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 271 (9th Cir. 1996)). The Court is required to consider this "strong inference" when deciding a motion for summary judgment. *Id.* at 1098; *see also Schechner v. KPIX-TV*, 686 F.3d 1018, 1026 (9th Cir. 2012) (the "same-actor inference is a strong inference that a court must take into account on a summary judgment motion") (internal quotation marks omitted). If the inference applies, the plaintiff must present a "strong case of bias" in order to "overcome this inference." *Coghlan*, 413 F.3d at 1098. However, the inference may not apply when a biased subordinate influences the judgment of the decisionmaker:

> [I]f a subordinate, in response to a plaintiff's protected activity, sets in motion a proceeding by an independent decisionmaker that leads to an

adverse employment action, the subordinate's bias is imputed to the employer if the plaintiff can prove that the allegedly independent adverse employment decision was not actually independent because the biased subordinate influenced or was involved in the decision or decisionmaking process.

*Poland v. Chertoff*, 494 F.3d 1174, 1182 (9th Cir. 2007).

The Court finds that the "same actor" inference does not apply under the facts of this case. As discussed above, in terminating John, J. Cook relied on reports by Schnobrich and Loertscher. The evidence indicates that these supervisory-level employees engaged in biased conduct, including the use of racial slurs directed at John and moving John from job to job because it was "funny" and to "mess with him." The evidence also indicates that J. Cook knew that Schnobrich and Loertscher had themselves engaged in discriminatory conduct toward John. Thus, there is, at a minimum, a genuine dispute of material fact as to whether the decision by J. Cook to terminate John was truly independent and thus whether John was subjected to disparate treatment.

Finally, Defendants contend that John was terminated because of performance issues[6] and conflicts with other workers. However, as already discussed, the evidence shows that J. Cook relied on reports from two supervisors

---

[6] John had been disciplined for improperly preparing braces in July 2019 and was given a verbal warning for bending braces on two occasions prior to September 2019.

that he knew had themselves engaged in racially discriminatory conduct directed at John. The evidence also shows that other non-Black employees were not terminated even though they had performance issues that equaled or exceeded John's performance issues. Finally, there is evidence that John did not act aggressively toward his fellow workers; that he was fired because supervisors were tired of John's "complaints" about racial discrimination; and that complaints about his behavior were the result of a concerted effort by co-workers and possibly supervisors to get John fired, an effort that John specifically complained about to his supervisors and upon which no action was taken.

These facts, viewed in the light most favorable to John, are sufficient to raise a genuine dispute of fact as to whether John was treated less favorably than his peers and whether Defendants' reason for terminating John is pretext.

### 4. Retaliation

To establish a prima facie case of retaliation, a plaintiff must establish "(1) a protected activity; (2) an adverse employment action; and (3) a causal link between the protected activity and the adverse employment action." *Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1034 (9th Cir. 2006) (citation omitted). "Causation sufficient to establish the third element of the prima facie case may be inferred from . . . the proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809 F.2d 1371,

1376 (9th Cir. 1987).

Here, Defendants do not dispute that John engaged in protected activity when he complained about discrimination and that his termination was an adverse employment action. Instead, Defendants challenge only the third element of a retaliation claim, contending that John cannot establish the necessary causal link between his protected activity and his termination. The Court disagrees.

John engaged in protected activity on numerous occasions. For example, he complained about a co-worker wearing a jacket with a confederate flag. He reported to his supervisors that he was concerned that his co-workers were biased and were trying to get him fired. He complained to S. Cook and Loertscher about a co-worker's statement in the lunchroom regarding "[n-word] work." He complained about his supervisors calling him "boy." Finally, he complained to HR about the discriminatory conduct to which he had been subjected.

Shortly after many of these incidents, John was subjected to adverse employment action. After John complained about Schnobrich calling him "boy," Loertscher and Schnobrich accused John of engaging in "hostile and aggressive" actions, told him that they had received multiple complaints about him, and advised him to change his attitude toward co-workers. Yet, when asked about the complaints against John, Loertscher could only name two incidents, both of which

John denies occurred. Moreover, Schnobrich was "off put" by John's complaint about the "boy" incident, and when John complained to Loertscher about the "boy" incident, Loertscher said to John, "Don't make me fire you."

Further, John was terminated within hours of making a complaint to HR about the discriminatory conduct to which he had been subjected. The Court recognizes that Defendants have submitted evidence that J. Cook, who terminated John, did not know of John's complaint to HR. However, the timing of John's termination raises issues of fact that cannot be resolved on summary judgment.

In addition, there is an inconsistency between Eden's testimony that he had nothing further to do with John after John's initial call and Nadeau's testimony that it was Eden who informed her later that same day that John had been terminated. Further, although J. Cook testified that he did not know of John's contact with HR prior to the termination and relied primarily on the incident between John and Jones the previous night, Loertscher testified that when he discussed that incident with J. Cook, there was no mention or discussion of John being terminated.

In sum, there are genuine issues of material fact regarding causation that preclude summary judgment on the retaliation claim.

### 5. *Liability of SME Industries*

Defendants also seek summary judgment as to all claims against SME Industries, Inc., on the ground that CoreBrace employed John, and that SME is

merely a parent corporation of CoreBrace that never contracted with nor employed John. Defendants contend that, as a result, SME cannot be held liable for any Title VII violations of CoreBrace.

Under Title VII, liability only attaches for discrimination if an entity is the "employer" of the plaintiff. 42 U.S.C. § 2000e-2(a); *see EEOC v. Global Horizons*, 915 F.3d 631, 637 (9th Cir. 2019). However, it is also "well-settled that an individual can have more than one employer for Title VII purposes." *Global Horizons*, 915 F.3d at 637. "The law recognizes that two entities may simultaneously share control over the terms and conditions of employment, such that both should be liable for discrimination relating to those terms and conditions. The two entities in such circumstances are deemed to be joint employers of the employees in question." *Id.*; *see Watson v. Gulf & Western Industries*, 650 F.2d 990, 993 (9th Cir. 1981) (noting that, "[i]n the absence of special circumstances, a parent corporation is not liable for the Title VII violations of its wholly owned subsidiary," and that such special circumstances allowing for parent corporation liability include where the parent corporation "participated in or influenced the employment policies" of the subsidiary).

The test for determining whether a parent corporation is a joint employer of a subsidiary's employee, and thus can be held liable as an employer under Title VII

was recently clarified in *Global Horizons* as being the common-law agency test.[7]

915 F.3d at 638-39. The "principal guidepost" under this test is the elements of

control, i.e., "the extent of control that one may exercise over the details of the

work of the other." *Id.* (quoting *Clackamas Gastroenterology Associates, P.C. v.

Wells*, 538 U.S. 440, 447 (2003) (internal quotation marks omitted)).

The factors to consider when analyzing whether the requisite level of control

exists include (but are not limited to):

> the skill required; the source of the instrumentalities and tools; the
> location of the work; the duration of the relationship between the
> parties; whether the hiring party has the right to assign additional
> projects to the hired party; the extent of the hired party's discretion
> over when and how long to work; the method of payment; the hired
> party's role in hiring and paying assistants; whether the work is part of
> the regular business of the hiring party; whether the hiring party is in
> business; the provision of employee benefits; and the tax treatment of
> the hired party.

*Id.* (quoting *Nationwide Mutual Insurance Co. v. Darden*, 503 U.S. 318,

323-24 (1992)).

"There is no shorthand formula for determining whether an

---

[7] Both parties rely on the joint employer analysis adopted by the Ninth Circuit in *Global Horizons*. When viewed together, *Global Horizons* and *Watson* establish that application of the *Global Horizons* joint employer analysis is appropriate to determine whether, under *Watson*, "special circumstances" exist that would make a parent corporation liable for Title VII violations of its wholly owned subsidiary. *See Global Horizons*, 915 F.3d at 638-39; *Watson*, 650 F.3d at 993.

employment relationship exists"; it is necessarily a "fact-intensive" exercise. *Id.* at 638-39 (citation and internal quotation marks omitted).

Here, viewed in the light most favorable to John, the evidence demonstrates that SME is the sole member of CoreBrace; that CoreBrace relies on SME for much of its administrative functions including payroll, HR, accounting, legal, purchasing, and even some safety and sales services. This means John's method of payment and employee benefits came from SME. All W-2s and tax reporting documents for CoreBrace employees list SME as the employer. The HR personnel that John contacted and who dealt with John's complaints and termination were provided by and paid for by SME. This is significant in the context of employment discrimination because SME would have been primarily responsible for establishing and implementing the company policies related to discrimination training and reporting. Moreover, the employee handbook for CoreBrace lists SME as the employer.

Additionally, SME and CoreBrace are consolidated for tax reporting purposes and share use of the Pocatello facility. Indeed, many of CoreBrace's upper management and staff operate out of SME's corporate office in West Jordan, Utah. Simply put, CoreBrace was designed to function within the broader family of SME-related companies, and many of the employment policies that influenced

John's employment were controlled by SME services.

Admittedly, as Defendants note, SME is a holding company with technically no employees, and CoreBrace and J. Cook appear to operate autonomously in many employment matters. John's day-to-day work even appears to have been solely controlled by CoreBrace personnel. But SME controlled some aspects of John's employment, most notably HR and payroll, and for purposes of summary judgment, the Court cannot say with confidence that this fact-intensive exercise definitively negates the possibility that SME was a joint employer of John.

In sum, the evidence raises a genuine issue of material fact as to whether SME is a joint employer of John.

Finally, when the factors indicate that "a joint-employment relationship exists, one joint employer is not automatically liable for the actions of the other. Liability may be imposed for a co-employer's discriminatory conduct only if the defendant employer knew or should have known about the other employer's conduct and failed to undertake prompt corrective measures within its control." *Global Horizons*, 915 F.3d at 641 (internal citations and quotations omitted).

As discussed previously, precisely what J. Cook and other HR personnel knew and when they knew it remains unclear. As such, the Court finds that there are also genuine issues of material fact as to (1) whether SME knew or should have

known about the alleged discriminatory conduct and (2) whether SME failed to take remedial measures. Summary judgment on the joint employer issue is therefore precluded.

### 6. Punitive Damages

Finally, Defendants seek summary judgment on John's request for punitive damages. Under Title XII, a plaintiff may recover punitive damages if they show the defendant "engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). While it is "unnecessary to show actual malice to qualify for a punitive award . . . its intent standard, at a minimum, require[s] recklessness in its subjective form." *Kolstad v. Am. Dental Ass'n.*, 527 U.S. 526, 536 (1999) (citing *Smith v. Wade*, 461 U.S. 30, 45-48 (1983)). In the context of employment discrimination, "an employer must at least discriminate in the face of a perceived risk that its actions will violate federal law to be liable in punitive damages." *Id.*

When an agent of the employer perpetrates the malicious or reckless discrimination, "[t]he plaintiff must impute liability for punitive damages to [the employer]." *Id.* at 539. One way in which a plaintiff may do so is by showing that the discriminating agent served in a "managerial capacity . . . while acting in the scope of employment[.]" *Id.* at 543 (citation and internal quotation marks omitted).

However, "an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with Title VII." *Id.* at 545 (citation and internal quotation marks omitted).

Defendants first argue that they did not engage in any discriminating practice with malice or reckless indifference to John's rights. Defendants claim J. Cook never discriminated against John, had minimal knowledge of any racial discrimination, and terminated John because of poor performance. Additionally, Defendants claim their good faith efforts to implement non-discrimination policies protect them from any discrimination by their employees being imputed to them. However, viewing the evidence in John's favor, the Court finds that a reasonable juror could conclude otherwise. *See Autozone, Inc. v. EEOC*, 421 Fed. Appx. 740, 742 (9th Cir. 2011) (finding that defendant "was not immune from punitive damages because a reasonable juror could certainly have determined that it had not acted in good faith to comply with Title VII").

As already explained, there is ample evidence to show that John's supervisors, Loertscher and Schnobrich, engaged in discriminating practices. Their derogatory comments, unusual treatment of John compared to his peers, and mishandling of his complaints create a genuine issue of fact as to their mental state

and whether they engaged in their discriminatory conduct with malice or reckless indifference to John's rights. Moreover, because Loertscher and Schnobrich are managerial agents of Defendants, their misconduct can be imputed to Defendants for purposes of punitive damages. Additionally, whether Defendants made good faith efforts to comply with Title VII remains unclear. For example, there is evidence that Defendants handled John's complaints less seriously than those of his White coworkers. This casts doubt on whether Defendants earnestly implemented their own non-discrimination policies.

In sum, there are genuine issues of material fact regarding punitive damages that preclude summary judgment.

## ORDER

**IT IS ORDERED that:**

1.   Plaintiff's Motion to Strike (Dkt. 27) is **DENIED**.

2.   Plaintiff's Motion for Leave to Supplement (Dkt. 28) is **GRANTED**.

3.   Defendant's Motion for Summary Judgment (Dkt. 20) is **DENIED**.

DATED: July 26, 2021

_____
B. Lynn Winmill
U.S. District Court Judge